34

## MINNESOTA MIN. & MFG. CO. v. INTER-NATIONAL PLASTIC CORPORA-TION et al.

### No. 44C202.

District Court, N. D. Illinois, E. D.

May 28, 1945.

George I. Haight and M. K. Hobbs, both of Chicago, Ill., and E. G. Carpenter, Harold J. Kinney, and Robert I. Coulter, all of St. Paul, Minn., for plaintiff.

Theodore S. Kenyon and Frederick Bachman, both of New York City, and Clarence J. Loftus, of Chicago, Ill., for defendant.

BARNES, District Judge.

This suit came on for hearing on the complaint of Minnesota Mining & Manufacturing Company, hereinafter sometimes called "Minnesota," against International Plastic Corporation, hereinafter sometimes called "International," and David A. Smart, hereinafter sometimes called "Smart," filed February 16, 1944, on the answer thereto and counterclaim filed June 30, 1944, on a reply to said counterclaim filed October 31, 1944, and on amendments to said answer filed, respectively, on November 27, 1944, March 23, 1945, and March 28, 1945.

The complaint charges infringement of claims 4, 5, 6, 8, 10, 11, 15, and 16 of Drew patent 2,177,627 for adhesive sheeting issued to Minnesota on October 31, 1939, on an application of Richard Gurley Drew, filed February 18, 1938, which application was a division of a co-pending application filed June 10, 1933, and was in part a continuation of a co-pending application filed May 1, 1931. Minnesota, by its complaint, seeks an injunction and an accounting.

International and Smart deny infringement and allege invalidity because (a) the disclosure was anticipated, (b) the disclosure lacked invention, (c) the specifications and claims were inadequate, (d) the application was not filed until more than two years after the alleged invention and discovery were in public use and on sale in this country by the plaintiff, (e) the applications filed May 1, 1931, and June 10, 1933, by the patentee were invalid and void because the prosecution thereof was deliberately delayed for the purpose of prolonging the plaintiff's monopoly, (f) Drew was not the original or first inventor or discoverer, and (g) Drew surreptitiously and unjustly obtained a patent for that which was in fact devised by one Guth, who was using reasonable diligence in adapting and perfecting the same. International and Smart also charge that the plaintiff has used and is using the patent against public policy and beyond any monopoly embraced in the alleged invention and in ways contrary to the public interest, and that, accordingly, the plaintiff's hands are unclean. Other defenses were presented which were not pressed at the trial. International and Smart, by their counterclaim, ask for a judicial declaration that the letters patent are invalid and void and not infringed by the defendants.

The portions of the specifications of the patent necessary for an understanding of the claims in suit and the claims in suit are as follows:

"This invention relates to adhesive sheets having a backing with a non-fibrous surface (such as normal or waterproofed films of regenerated cellulose) and a coating of normally tacky and pressure-sensitive adhesive united thereto. While not limited thereto, the invention relates especially to transparent adhesive sheets, to adhesive sheets in the form of adhesive tapes which may be sold in stacked or coiled form, and to adhesive sheets or tapes which are well adapted to the sealing or securing of wrappers composed of non-fibrous lustrous cellulosic films and the like.

"This application is a division of my co-pending application Ser. No. 675,291, filed June 10, 1933, and is in part a continuation of my co-pending application Ser. No. 534,-386, filed May 1, 1931.

"The development of packaging and wrapping sheets composed of thin, transparent and flexible non-fibrous films has raised special problems as to sealing or fastening with adhesives. Likewise, the desirability of using such films as backings for adhesive tapes cannot be met by use of the old conventional adhesives. Such sheet material is exemplified by gelatinized cellulosic materials which form films, such as regenerated cellulose, cellulose esters (as cellulose nitrate, cellulose acetate-butyrate and cellulose acetate), and cellulose ethers (as ethyl cellulose and benzyl cellulose), and by regenerated cellulose films which have been waterproofed by coating on one or both sides with a layer or film of a cellulose derivative. The popularity of these materials resides in such quantities as brilliancy, sheen and transparency, and in the later development of such material, in the quality of waterproofness. Ordinary glue type adhesives are insufficiently adherent by reason of the non-porous or highly glazed surfaces provided by this type of sheet material.

"In accordance with this invention, sheets of such film material are provided with coatings of normally tacky and pressure-sensitive adhesive firmly united thereto. By 'normally tacky and pressure-sensitive' it is meant that under ordinary atmospheric conditions the adhesive is stably in a condition such that it does not need to be activated by solvents or heat or otherwise prepared in order to secure good adherence to surfaces against which the adhesive coating (with its backing) may be pressed when used. An adhesive coating is provided which enables the adhesive sheeting to be affixed to smooth lustrous surfaces, such as non-fibrous cellulosic surfaces of wrapping or packaging sheets or films. An object of the invention is to provide a unified adhesive coating possessed of such coherence in relation to adhesiveness and so firmly united to its backing that the adhesive sheet may be stripped from smooth non-fibrous surfaces (not possessing special chemical affinity for the adhesive), to which it may have been temporarily applied, without offsetting of adhesive material. Hence the adhesive coating may be termed 'non-offsetting,' and this expression designates an important physical or physico-chemical property or characteristic of the adhesive coating, namely, that its coherency is greater than its adhesiveness. Further, an object is to provide adhesive sheets having an adhesive coating that is in elastic equilibrium with its backing so that warping and curling of the sheet, and blistering of the adhesive coating, are avoided.

\* \* \* \* \* \*

"Adhesive sheets are provided in which all components and the composite are transparent, so that the sheets may be applied without concealing the coloring or markings of the surfaces to which applied.

"The transparent backing may be printed in reverse, on the face which carries the adhesive and prior to coating, to provide an adhesive sheet with the printing visible through and protected by the backing.

"The adhesive sheets may be prepared with a surface continuously coated with adhesive, as in the case of ordinary adhesive tapes, labels and seals, or with the adhesive on certain areas only, as in the case of a packaging sheet provided with coated portions to permit sealing without the use of other sealing means.

"It is preferred that the backing to which the adhesive coating is united be a transparent, flexible, non-fibrous film of gelatinized cellulosic material, such as regenerated cellulose (as normal or unwaterproofed 'cellophane'), cellulose esters (as cellulose nitrate and cellulose acetate), cellulose ethers (as ethyl cellulose), or composites of such materials as, for example, a film of regenerated cellulose coated on one or both surfaces with a waterproofing film of a cellulose derivative (as a cellulose ester or ether). However, I may utilize backings comprised of materials other than gelatinized cellulosic materials, and which are either non-fibrous or are coated with non-fibrous films (preferably waterproof) composed of cellulosic or other suitable material, including varnishes, lacquers, etc.

"In its preferred form my invention is particularly applicable to transparent films of gelatinized cellulosic materials, such as regenerated cellulose, which is clear, transparent and lustrous.

\* \* \* \* \* \*

"The regenerated cellulose film so produced may be waterproofed either on one side or on both sides, with a suitably compounded thin film of nitro-cellulose, cellulose acetate, cellulose ether, and similar cellulosic compounds. It will be understood that the waterproofing ingredients may include oxidized oils, varnishes and lacquers. The primary requisite is the application of these waterproofing films so as not to impair the lustrous and transparent characteristics of the sheet formed and to

overcome any tendency to provide a warped sheet by the waterproofing layer that may be applied. Additionally, coatings such as transparent rubber, synthetic resins, and like materials may be used as a waterproof coating.

\* \* \* \* \* \*

"In the examples C and D given above, paraffin oil has been included for purposes of plasticizing the rubber. I have found that in order to obtain maximum transparency and the highest possible bond strength and firmness of the adhesive inter se, the paraffin oil may be omitted.

"Such adhesive coating, particularly valuable for this purpose, is as follows:

### Example E

| | Parts |
|---|---|
| Rosin | 160 to 200 |
| Thin latex crepe rubber | 250 |
| Beta naphthol | 2.5 |

"Approximately 3248 parts of benzol may be added to the above ingredients to provide a readily spreadable cement, and the ingredients may be incorporated in the benzol without the necessity for milling.

"In the example given, beta naphthol has been specified and this is primarily used as an anti-oxidant. This material is desirable in the above formula, as well as in the other formulæ given under A, B, and C, in that the adhesives are given longer life.

"Other anti-oxidants are desirable and may be included wherever rubber is used in the adhesive. Such anti-oxidants which may be used are as follows:

"(1) Aldol-alpha-naphthylamine.

"(2) Phenyl-beta-naphthylamine.

"(3) Symmetrical-di-beta-naphthyl-para-diylene-diamine.

"In the examples as above given, the proportions are by weight and variation may be made in the primary materials, as well as the quantity of the ingredients. Thus, in the examples given under C, D and E, latex crepe, the rubber component, may be varied by substitution in part or in whole by smoked sheet rubber. Though the synthetic resins, such as cumarone resins above referred to are preferred, various blends of other synthetic resins may be utilized, in part or in whole. To a certain extent, the wood rosin may be substituted by various grades of gum rosin.

"In making the adhesives, the rubber base and the resin base determine the tackiness exhibited by the finished product.

This relationship, also coupled to a certain extent with the treatment given to the rubber, determines this factor.

"In producing a clear adhesive, the relationship of plasticizer (above listed in the form of liquid paraffin oil) and resinous material may be considered as constituting the tack producing phase of the adhesive and up to a certain point the greater the quantity of the tack producing phase that is added to the rubber, the greater the tackiness exhibited in the rubber base adhesive.

"In general, for every two parts of rubber base, by weight, one part by weight of the tack producing phase may be added. As indicated above, the resinous content may be varied to increase or decrease the tackiness. However, in order to provide a unified adhesive, satisfactory for purposes of unwinding of the tape from rolls, the resinous content must be retained within certain limits beyond which the adhesive is likely to offset at normal atmospheric temperatures.

"In the formulæ above cited, double break down latex crepe rubber has been referred to and the treatment of this product alone as well as the addition of the tack producing phase therewith, will control the characteristics of the adhesive layer. Thus, double break down latex crepe, as contemplated by me above, results from milling latex crepe rubber for approximately fifteen minutes to plasticize the same, with or without heat, and after aging for twenty-four hours, is again plasticized in a mill. At this stage, the material is suitable for addition to the material constituting the tack producing phase. This may be accomplished as follows:

"Method A.—200 parts of rubber (double break down latex crepe from the rubber mill as above described) are placed in an internal mixer where the para cumarone resin, wood rosin and paraffin oil (where this is used) are gradually added during the mixing operation to thoroughly incorporate the same into the rubber. No solvent need be used if the mixer is powerful enough to knead these resinous materials into the rubber. When this dry mixing has been thoroughly accomplished, a rubber solvent, such as heptane or benzol, is introduced while the internal mixer is maintained in operation. This action is continued until complete solution results. The quantity of solvent added is in accordance with the means to be employed for spreading this material upon the backing material.

"Method B.—200 parts of rubber (preferably double break down latex crepe as above made) are placed in a stirring equipment where paddles agitate the solvent and other ingredients into solution. When 200 parts of rubber have been placed into this mixer, the agitating member is started and a quantity of rubber solvent, such as heptane or benzol, is added to dissolve the rubber. The resinous materials in this particular example, para cumarone resin, wood rosin and the liquid paraffin oil (where this is used), are dissolved in a separate mixer, using an additional quantity of solvent, for example heptane or benzol. When these parts are uniformly distributed and in solution, the parts from each mixer are combined. The quantity of benzol or other solvent is calculated in accordance with the method which may be used for spreading it upon the backing material. The solvent is evaporated after coating or spreading of the adhesive upon the backing material.

"In use, the adhesive as above described may be directly applied to the backing or sheets of transparent gelatinized cellulosic materials, previously enumerated, and forms a desirable product.

"Where considerable unification is desired between the adhesive layer and the backing material, to assure proper anchorage of the adhesive layer with the backing material, thereby assuring satisfactory unwinding or separation when the composite is formed into rolls or stacks, it is preferred to first coat the sheet of gelatinized cellulosic material with a priming composition. Priming on one surface is particularly effective with sheets formed of regenerated cellulose. The priming operation consists of first coating the backing material before application of the adhesive materials previously described.

"The priming composition as preferred by me is a solution of a rubber resin mixture in an organic solvent in which the solid materials may be varied from 15 to 50% with 85 to 50% of the solvents used. Preferably the solids constitute about 17% of the solution so prepared.

\*     \*     \*     \*     \*     \*

"Where nitrocellulose is used for the waterproofing layer, it may be highly plasticized by resinous material, which may be used in the proportion of 67-50% to 33-50% of nitrocellulose material. The following is given as an example of a solution which when applied to the regenerated cellulose backing, will form a coating of this type upon evaporation of the solvents:

|  | Parts |
|---|---|
| Nitrocellulose, such as "½ second cotton" | 9 |
| Xyol | 15 |
| Cellosolve (ethylene glycol monoethyl ether) | 10 |
| Resin, such as "Rezyl 12" (a condensation product of castor oil and phthalic anhydride) | 12 |
| Dammar cut (a solution of 40% dammar resin and 60% benzol) | 16 |

"The method of application of the coating materials above described will, to a large extent, depend upon the character of the coating. The primer and adhesive coatings may be successively applied where these are used in solutions of volatile solvents, by an offset process from rollers uniformly coated with the primer compositions or the adhesive composition. With the more viscous composition of either primer or adhesive, these papers may be coated upon the backing by a knife spreader. For the more plastic form of either composition and where unification is desired, calendering, or frictioning of these materials may be resorted to, to apply either the priming coat, or the adhesive coat or both.

"As an example of one method which may be followed in preparing the composite, the following procedure is recommended. A web of regenerated cellulose film of the desired thickness (which may have been printed on the face receiving the primer) is carried through a set of vertically positioned squeeze rolls. The lower roll has transferred to it, or dips into, the solution of the primer composition. A uniform layer of primer is applied at this point to the film or web of backing material. The web thus prepared travels from the squeeze rolls, to a duct for removing and drying off the solvents in the primer. The web then is directed to a contrivance for coating, at which point a doctor knife or coating knife is used to spread a film of the composition of adhesive material. The composition is directly applied over the primer and the composite as coated is either hung in festoons or travels through a drying duct, at which point sufficient time is allowed for complete removal of the solvent, and to form the deposition product to the desired consistency, due to the solid components present, for tackiness. If heat has

been utilized to separate the solvent from the deposition product resulting in the adhesive, the composite thus formed may be cooled and brought to room temperature, to render the product in more convenient form for stacking or winding into rolls. Where wound into rolls, the composite thus formed is then cut or converted into small rolls, suitable for trade requirements.

"The adhesive composition as deposited upon the film as heretofore described is one which is normally tacky and pressure-sensitive. It is of particular utility in connection with the lustrous, highly polished backing material described, in that the adhesive layer is in equilibrium with it and will not alter or warp its appearance. As indicated, the adhesive layer is unified in that it has great adhesion inter se (coherence) and when applied forms a unified product with the backing material. When wound into rolls or formed into stacks, the lustrous surface of the backing will not be modified, no offsetting will occur and ready separation is assured of the entire composite from its adjacent layer.

"Where the product may encounter low humidities or low temperatures, it may be desirable to coat the back side of the backing material with a protective coating, such as a thin film of glycerine. In such event, a protective coating is applied which is not disintegrated by or which does not interfere with the adhesive action of the adhesive layer. It will be understood, however, that under ordinary conditions, the composite of backing material and adhesive layer as hereinbefore described is a complete unified product and no further treatment need be made.

"The foregoing adhesive coatings are characterized by being water-insoluble and in themselves make for a waterproofing of the underlying base.

### Primer No. 5

| | |
|---|---|
| Casein ................ | 3 to 8 pounds, preferably 5 pounds |
| Water ................ | 9 to 40 pounds, preferably 30 pounds |
| Concentrated ammonium hydroxide ............ | 1 to 8 pounds, preferably 3 pounds |
| Rubber latex (preferably 60% concentration).... | 3 to 25 pounds, preferably 16 pounds |

"The characteristic features ` the above primer are that it is compatible with the backing material where it is regenerated cellulose, such as Cellophane, flexibilized with glycerine, or such cellulosic material including the cellulosic compounds previously enumerated, coated with waterproofing materials, and is also compatible with any of the previously mentioned water-insoluble pressure-sensitive adhesive coatings.

"In the formula of Primer No. 5, I have referred to the use of casein in connection with rubber latex. The casein is more or less water-soluble, especially in the presence of the ammonium hydroxide, and not only facilitates anchorage to glycerine-treated Cellophane when this is used as the backing, but is also compatible with the water-soluble type of adhesive coating when the priming coat is finally dried. This water-insoluble material, as included in the primer may be supplemented by or substituted by glue, isinglass or gelatin, and other similar water-soluble materials, which not only facilitate the dispersion of the latex but also include the feature of being compatible with water-soluble materials. It will further be noted that though in the preferred form of the primer, where casein is used, it is preferred to use ammonium hydroxide in order to facilitate the solution of the casein, the quantity of ammonium hydroxide may be reduced where other water-soluble materials are used and merely sufficient ammonium hydroxide is used to prevent untimely separation of the solids of the rubber latex.

"The rubber included in the emulsion type of primer is for purposes of having some material compatible with the water-insoluble adhesive coating and water-insoluble backing, and while I have specified in my preferred form of primer the inclusion of a dispersion of rubber latex, dispersions of natural and synthetic resins, particularly those which will give a clear and colorless or water-white residium, may be substituted for the latex.

"In general my emulsion type primer may be characterized as a double phase primer to the extent that it includes emulsified ingredients of both water-soluble and water-insoluble characteristics, in dispersed form.

"It will be understood that in the application of the primer to the backing material, drying is effected after coating, before the adhesive coating is applied.

\* \* \* \* \* \*

"What I claim is as follows:

\* \* \* \* \* \*

"4. A transparent adhesive sheet comprising a non-fibrous transparent flexible film backing having non-porous surfaces and a water-insoluble normally tacky and

pressure-sensitive transparent flexible adhesive coating, said adhesive coating being firmly united to said backing and the adhesive and backing being of such kinds that the back surface of the backing is inactive to the adhesive coating to a degree permitting unwinding of the adhesive sheet from rolls thereof without delamination or offsetting of adhesive.

"5. A transparent adhesive sheet comprising a non-fibrous transparent flexible film backing having non-porous surfaces and a water-insoluble transparent adhesive coating having a rubbery base and so composed that it is non-offsetting and normally tacky and pressure-sensitive, said adhesive coating being firmly united to said backing and the adhesive and backing being of such kinds that the back surface of the backing is inactive to the adhesive coating to a degree permitting unwinding of the adhesive sheet from rolls thereof without delamination or offsetting of adhesive.

"6. A transparent adhesive sheet comprising a non-fibrous transparent flexible cellulosic film backing having non-porous surfaces and a water-insoluble transparent adhesive coating having a rubbery base and so composed that it is non-offsetting and normally tacky and pressure-sensitive, said adhesive coating being firmly united to said backing and the adhesive and backing being of such kinds that the back surface of the backing is inactive to the adhesive coating to a degree permitting unwinding of the adhesive sheet from rolls thereof without delamination or offsetting of adhesive.

\* \* \* \* \* \*

"8. An adhesive sheet comprising a transparent flexible non-fibrous cellulosic film backing having smooth lustrous surfaces and a water-insoluble normally tacky and pressure-sensitive non-offsetting transparent, rubber-resin type adhesive coating firmly united to said surface, the composite sheet being transparent.

\* \* \* \* \* \*

"10. An adhesive sheet comprising a transparent flexible non-fibrous film having non-porous surfaces, a coating thereupon of a non-offsetting transparent normally tacky and pressure-sensitive water-insoluble adhesive and an interposed transparent primer coating unified both to said surface and to said adhesive coating, the composite sheet being transparent and its parts so firmly united that it may be unwound from rolls thereof without delamination or offsetting of adhesive.

"11. A transparent adhesive sheet comprising a non-fibrous transparent flexible film backing having non-porous surfaces, a water-insoluble transparent adhesive coating having a rubbery base and so composed that it is non-offsetting and normally tacky and pressure-sensitive, and an interposed transparent flexible primer coating firmly bonding said adhesive coating to the backing, the adhesive sheet having its parts so firmly united that it may be unwound from rolls thereof without delamination or offsetting of adhesive.

\* \* \* \* \* \*

"15. An adhesive sheet comprising a non-fibrous flexible film backing having non-porous surfaces and a water-insoluble normally tacky and pressure-sensitive flexible adhesive coating, said adhesive coating being firmly united to said backing and the adhesive and backing being of such kinds that the back surface of the backing is inactive to the adhesive coating to a degree permitting unwinding of the adhesive sheet from rolls thereof without delamination or offsetting of adhesive, said adhesive sheet transmitting light so that the sheet will not conceal the coloring or markings of surfaces to which applied.

"16. An adhesive sheet comprising a non-fibrous flexible film backing having non-porous surfaces, a water-insoluble normally tacky and pressure-sensitive flexible adhesive coating, and an interposed flexible primer coating firmly bonding said adhesive coating to the backing, the adhesive and backing being of such kinds that the back surface of the backing is inactive to the adhesive coating to a degree permitting unwinding of the adhesive sheet from rolls thereof without delamination or offsetting of adhesive, said adhesive sheet transmitting light so that the sheet will not conceal the coloring or markings of surfaces to which applied."

International and Smart pleaded and relied on the following patents and publications:

U. S. Patents:

Thornton & Rothwell, No. 786,534.
Brandenberger, No. 1,221,825.
Segall, No. 1,259,787.
Hodgson, No. 1,467,108.
Respess, No. 1,533,272.
Teague, No. 1,719,948.
Charch & Prindle, No. 1,737,187.
Healy, No. 1,752,557.
Drew, No. 1,760,820.
Schnitzler, No. 1,837,680.

Mantell, No. 1,850,760.

Ozmun, No. 1,933,026.

Publications:

Pearson's book on Crude Rubber, published in 1918.

Schatz's book on Commercial Art, copyrighted in 1922.

Weber's book on The Chemistry of Rubber Manufacture, published in 1926.

Modern Packaging Magazine, issue of November, 1927.

### Findings of Fact.

1. Minnesota is a corporation organized and existing under and by virtue of the laws of the state of Delaware and has its principal place of business at St. Paul, Minnesota. International is a corporation organized and existing under and by virtue of the laws of the state of Illinois, having its registered office and registered agent (Mr. Alfred Smart) at 919 North Michigan Avenue, Chicago, Illinois. Smart has his office and place of business at 919 North Michigan Avenue, Chicago, Illinois, and resides in the Eastern Division of the Northern District of Illinois.

2. The jurisdiction of this court is based on the fact that this is a suit in equity arising under the patent laws of the United States.

3. Minnesota is the sole and exclusive owner of the entire right, title and interest in and to the patent in suit.

4. The claims in suit cover subject matter described in the co-pending application Serial No. 534,386, filed May 1, 1931, and the patent in suit has an effective filing date of May 1, 1931, with respect thereto. This subject matter was also described in the co-pending application Serial No. 675,291, filed June 10, 1933, of which the application for the patent in suit was filed as a division on February 13, 1938. The obtaining of a patent on the product of the claims in suit was not unduly delayed.

5. The patent in suit gives a sufficiently full, accurate and definite description of the invention to enable those skilled in the art to make the product thereof specified in the claims here in suit.

6. Each of the claims in suit is sufficiently clear, definite and particular to apprise those skilled in the art and the public generally of the scope thereof.

7. The claims in suit are drawn to a new kind of adhesive sheet or tape having a field of utility not possessed by any prior adhesive tape of any kind. As made and sold by Minnesota since 1931, it has gone into widespread use. It has been commonly used for sealing packages, mending maps and charts, and fastening posters on windows and bulletin boards, and for many other purposes.

8. Cellophane, rubber, and resins were all in widespread commercial use in this country since at least as early as 1913, and were available to anyone who might have conceived of the product set forth in the claims in suit.

9. A ready market for the adhesive sheets or tape defined in the claims in suit existed at least as early as the year 1900.

10. It was not want of materials or want of a market which delayed the appearance of the product of the claims in suit.

11. The Drew masking tape patent 1,760,820 does not anticipate the patent in suit. The Drew masking tape patent is concerned with masking tape having a fibrous, unified paper backing and does not describe nor suggest non-fibrous transparent backings having non-porous surfaces, and the tape of that patent is different in function and principle of construction from the product set forth in the claims in suit. Drew did not conceive of the product of the claims in suit until after his application for said masking tape patent had been filed on May 28, 1928.

12. The claims in suit are not anticipated by and define invention over Drew's earlier masking tape patent 1,760,820.

13. The disclosure of the Mantell patent 1,850,760 does not anticipate the product of the claims in suit. The Mantell patent relates to an artist's shading film, to be used in a manner similar to frisket paper and applied to drawings, photographs and the like, with "rubber frisket cement." The Mantell patent did not teach or suggest the product of the claims in suit. The alleged public use and sale of the Mantell structure adds nothing to the Mantell patent.

14. Rubber frisket cement has been well-known to commercial artists for at least thirty years and was well known in the art prior to Mantell. It consists of rubber dissolved in benzol or other suitable solvent, with no admixed rosin or other tackifier resin. The patent in suit clearly differentiates straight rubber coatings from the rubber-resin adhesives described therein.

15. The claims in suit define invention over the Mantell patent 1,850,760.

16. In devising the product of the claims in suit, Drew went in opposition to known concepts of the adhesive tape art and displayed ingeniousness beyond that of the normal thinking to be expected of persons skilled in that art.

17. Each of the claims in suit, namely, claims 4, 5, 6, 8, 10, 11, 15 and 16 involves novelty and invention over all the prior art relied upon by the defendants.

18. As between Durward O. Guth and Richard Gurley Drew, common employees of Minnesota, it was Drew, and not Guth, who originated the product of the claims in suit.

19. Richard Gurley Drew is the original, first and sole inventor of the adhesive sheeting described in said patent and claimed in the said claims here in suit.

20. The patent in suit was not obtained from the Patent Office through misrepresentation.

21. Prior to the filing of the complaint herein, on February 16, 1944, and within six years prior to such filing and not coming within the provisions of Sections 68 and 94, Title 35 U. S. Code Annotated, International manufactured, used, sold or offered for sale rolls of "Filmonize" transparent self-adhering tape, identified by the type or style numbers and exhibit numbers following:

(a) ND 45, Illustrated by Plaintiff's Exhibit Nos. 21, 25, 32 and 33

(b) ND 15, Illustrated by Plaintiff's Exhibit No. 26

(c) ND 18, Illustrated by Plaintiff's Exhibit Nos. 27 and 31

(d) ND 30, Illustrated by Plaintiff's Exhibit No. 28

(e) ND 10, Illustrated by Plaintiff's Exhibit No. 29

(f) ND 38, Illustrated by Plaintiff's Exhibit No. 34

(g) ND 24

22. Claims 4, 5, 6, 8 and 15 do not require the presence of a primer.

23. The use of a back "repellent" coating in International's accused tapes produces substantially the same result, in substantially the same way, by substantially the same means, as does the inside "primer" employed in Minnesota's preferred tape. In each case the back surface of the tape has a lower specific adhesion toward the pressure-sensitive adhesive layer than does the inner surface on which the adhesive layer is coated; in each case the resultant differential between the two surfaces aids in reducing or preventing offsetting of the adhesive when the tape is unwound from the roll; and in each case the adhesive is correlated with the back surface. The "repellent" back surface of International's tape is one which is inactive to the adhesive to a degree permitting unwinding of the tape from rolls without offsetting or transfer of adhesive.

24. The product of the claims in issue met with immediate public acclaim and has enjoyed an extensive commercial success due to its inherent merit.

25. International and Smart have infringed each of the claims of the patent in suit, namely, claims 4, 5, 6, 8, 10, 11, 15 and 16, by making, using, selling or offering for sale each of the adhesive sheets or tapes specified in Finding No. 21 above.

26. Smart aided, participated in, approved and ratified the manufacture and sale by International of the accused tapes.

27. In respect to the defendants' counterclaim, the court adopts the findings of fact set forth above.

Conclusions of Law.

A. This court has jurisdiction of the parties hereto and of the subject matter of this cause.

B. Claims 4, 5, 6, 8, 10, 11, 15 and 16 of the Drew patent in suit 2,177,627 are valid.

C. Minnesota has not been guilty of inequitable conduct and has not come into court with unclean hands, and is not barred from equitable relief.

D. Each of the aforesaid claims of the said Drew patent has been infringed by the International and Smart in the manufacture, use, sale or offer for sale of each of the adhesive sheets or tapes identified by the type or symbol numbers following:

(a) ND 45, Illustrated by Plaintiff's Exhibit Nos. 21, 25, 32 and 33

(b) ND 15, Illustrated by Plaintiff's Exhibit No. 26

(c) ND 18, Illustrated by Plaintiff's Exhibit Nos. 27 and 31

(d) ND 30, Illustrated by Plaintiff's Exhibit No. 28

(e) ND 10, Illustrated by Plaintiff's Exhibit No. 29

(f) ND 38, Illustrated by Plaintiff's Exhibit No. 34

(g) ND 24

E. Smart is a joint tort feasor with International.

F. Minnesota is entitled to a permanent injunction against further infringement by International and Smart of the claims of the Drew patent in suit and to an accounting of profits and damages and for costs.

G. In respect to the counterclaim of International and Smart, the court adopts the Conclusions of Law set forth above. The International and Smart are not entitled to relief under said counterclaim and the same should be dismissed.